AO 91 (Rev. 08/09) Criminal Complaint

FILED BY _____ D.C.

# UNITED STATES DISTRICT COURT
for the
Southern District of Florida

AUG 22 2013

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. FT. LAUD.

| United States of America | ) | |
|---|---|---|
| v. | ) | |
| PATRICK CAMPBELL | ) | Case No. 13-6402-BSS |
| | ) | |
| | ) | |
| | ) | |
| Defendant(s) | ) | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of __May 31, 2012 to the present__ in the county of _____Broward_____ in the __Southern__ District of __Florida, and elsewhere__ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 50 U.S.C 1701,1705<br>31 C.F.R. 560.416<br>31 C.F.R. 560.204<br>31 C.F.R. 560.203 | Brokering the supply of goods which the defendant knew were destined and intended for supply to Iran in violation of the International Emergency Economic Powers Act (IEEPA) Title 50, United States Code, Section 1701, 1705 and the Iranian Transaction Regulations, 31 CFR 560.416, 560,204 and 560.203. |

This criminal complaint is based on these facts:
See Attached Affidavit

☑ Continued on the attached sheet.

_____
Complainant's signature

Special Agent Louise Miller, ICE
Printed name and title

Sworn to before me and signed in my presence.

Date: Aug. 22, 2013

_____
Judge's signature

City and state: _____Fort Lauderdale, Florida_____   Barry S. Seltzer, CHIEF US MAGISTRATE JUDGE
Printed name and title

## AFFIDAVIT

I, Special Agent Louise Miller, U.S. Homeland Security Investigations, Immigration and Customs Enforcement, (hereinafter referred to as "ICE"), being first duly sworn, state as follows:

1. I am employed as a Special Agent with Immigration and Customs Enforcement (ICE), United States Department of Homeland Security, Ft Lauderdale, Florida, and have been since March 2008. I am presently assigned to the Counter Proliferation Group which investigates violations of the Arms Export Control Act, the International Emergency Economic Powers Act and the Export Administration Act. Prior to being employed as a Special with ICE, I was a Political Analyst with the Counter-Terrorism Center at the Central Intelligence Agency.

2. As a Special Agent with ICE, I have received training related to the enforcement of statutes of the U.S. Codes specifically related, but not limited to, the Export Laws of the United States, i.e., the Arms Export Control Act ("AECA") – Title 22, United States Code, Section 2751, et seq.; the Export Administration Act ("EAA") – Title 50, United States Code, Section 2401, et seq.; and the International Emergency Economic Powers Act ("IEEPA") – Title 50 United States Code, Section 1701, et seq. and the Iranian Transaction Regulations.

3. I am also familiar with related federal laws and the interpretation and application of federal laws and federal court procedures, and I have previously conducted and assisted in the execution of numerous federal arrest and search warrants. I have conducted and participated in investigations of violations of United States laws relating to the unlawful export from the United States of goods and technology restricted for export for reasons of national security, foreign policy, anti-terrorism, and embargoed destinations, and I am empowered to make arrests in connection with such violations.

4. The President of the United States of America, by virtue of the International Emergency Economic Powers Act, (IEEPA) Title 50, United States Code, Section 1701, et. seq., was granted authority to deal with unusual or extraordinary threats to the national security, foreign policy and economy of the United States.

5. The International Emergency Economic Powers Act (IEEPA), Title 50, United States Code, Section 1705 makes it a federal offense for a person to violate,

conspire to violate or cause a violation of any license, order, regulation or prohibition issued under this chapter.

6. On March 15, 1995, pursuant to IEEPA, the President issued Executive Order 12957 (E.O. 12957) finding that the actions and policies of the Government of Iran constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States, and declared a national emergency to deal with that threat.

7. On May 6, 1995, pursuant to IEEPA, the President issued Executive Order 12959 (E.O. 12959) to take steps with respect to Iran in addition to those set forth in E.O. 12957 of March 15, 1995, to deal with the unusual and extraordinary threat to the national security, foreign policy, and economy of the United States, referred to in that order.

8. In order to implement E.O. 12959, The United States Treasury Department, through the Office of Foreign Assets Control, issued the Iranian Transactions Regulations, Title 31, Code of Federal Regulations, Part 560. These regulations prohibit, among other things, (1) the supply, directly or indirectly, from the United States or by a United States person, wherever located, of any goods, technology or services, with knowledge or reason to know that the goods are intended specifically, directly or indirectly, for supply to Iran, Title 31, Code of Federal Regulations, Section 560.204, and (2) brokering the supply of goods from whatever source to Iran by a person within the United States or a United States person, Title 31, Code of Federal Regulations, Section 560.416. Title 31, Code of Federal Regulations, Section 560.203 provides that any transaction within the United States or by any United States person that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate any of the provisions in the Iranian Transactions Regulations is prohibited. Title 31, Code of Federal Regulations, Section 560.314 defines "United States Person" as any United States citizen, Permanent resident alien, entity organized under the laws of the United States (including foreign branches), or any person in the United States.

9. On August 19, 1997, the President continued the national emergency with respect to Iran and clarified the steps taken in Executive Orders 12957 and 12959, to deal with the unusual and extraordinary threat to the national security, foreign policy and

economy of the United States declared in Executive Order 12957 in response to the actions and policies of the Government of Iran.

10. In preparing this affidavit, I have conferred with other agents who are experienced in the area of enforcing federal laws relating to the illegal export of goods, articles and services. The opinions stated below are shared by these agents. Furthermore, the information contained in this affidavit is based on information obtained from other law enforcement personnel involved in the investigation.

11. Based upon the facts set forth below, your affiant has probable cause to believe that PATRICK CAMPBELL did knowingly and willfully act as a broker in negotiating the supply of goods which the defendant knew were destined and intended for supply to Iran in violation of the International Emergency Economic Powers Act (IEEPA) Title 50, United States Code, Section 1701, 1705 and the Iranian Transaction Regulations, 31 CFR 560.416, 560.204 and 560.203.

12. In or about May 2012, an ICE undercover agent (UCA) posted an advertisement on the website "Alibaba.com" in which the UCA purportedly was seeking to purchase Uranium 308. In or about May 2012 the ICE undercover agent (UCA) who was acting as an American broker representing the interests of individuals in Iran who were seeking to purchase Uranium 308 (hereinafter "U308"), received a response to this advertisement from PATRICK CAMPBELL who expressed interest in selling U308 from Sierra Leone. CAMPBELL informed the UCA that he was affiliated with a company named Horizon (SL) Limited which was engaged in the mining and selling of Uranium, Chromite, Gold and Diamonds for export to international companies. CAMPBELL advised that Horizon had mines in the Soa, Koduma and Tonbodu regions of Sierra Leone.

13. From June 2012, to the present, PATRICK CAMPBELL communicated with the UCA via telephone, Skype and email on several occasions during which time the UCA advised CAMPBELL that the UCA was seeking U308 to be delivered to a country in the Middle East to be disguised with other types of ore and which would yield 1,000 tons of the purified element. The UCA further identified Iran as the ultimate destination for the U308 and discussed with CAMPBELL the manner in which the shipment could

be accomplished. Set forth below is a summary of some of the pertinent communications.

14. Uranium 308 is known by the chemical formula $U3O8$ and its corresponding name Triuranium Octoxide which is derived from the element composition of 3 part Uranium and 8 parts Oxygen. It is also commonly referred to as "Yellowcake". When further processed Yellowcake becomes enriched Uranium and can be used in the manufacture of nuclear fuel and can also be used in nuclear weapons.

15. The United States Department of Treasury, Office of Foreign Assets Control provided a License determination which shows that the export of Triuranium Octoxide (U308) directly or indirectly to Iran is prohibited pursuant to the Iranian Transactions Regulations 31 C.F.R., part 560, issued under the authority of the International Emergency Economic Powers Act, 50 U.S.C. 1701-1706 and that no record could be found for PATRICK CAMPBELL or Horizon Limited, Sierra Leone.

16. On June 5, 2012, CAMPBELL advised the UCA in a telephone call that he was aware that this was a delicate business transaction because of the Middle Eastern company which was involved but that he had the U308 and asked the UCA to establish a SKYPE account so that they could talk further.

17. On June 5, 2012, CAMPBELL advised the UCA in a SKYPE conversation that shipping the U308 from Sierra Leone will not be a problem and that he will mix the Uranium with Chromite Ore to disguise it. CAMPBELL further advised the UCA that the majority of their sales are in Uranium and Chromite and that he has sold U308 to agencies in China and Ecuador [pmm]. The UCA informed CAMPBELL that there are many restrictions on sending U308 to the Middle East and CAMPBELL responds that the UCA should not worry because he can handle any situation in Sierra Leone because you can pay the government officials to export "minerals."

18. On June 6, 2012, CAMPBELL engaged in a telephone call with the UCA and requested an update from the UCA and advised the UCA in a telephone call that he would prepare an Memorandum of Understanding once the UCA provides details for the transaction. The UCA advised CAMPBELL that they need to be discrete and careful because the transaction is being financed through a company in Florida and CAMPBELL suggested that he no longer use the word Uranium in their discussion and suggest that

they refer to it as "MEUS" which CAMPBELL advised would stand for Middle Eastern Uranium Shipment.

19. On June 7, the UCA advised CAMPBELL by email that because of all of the laws regarding the Middle East they should be careful and should try a test of 200 tons of MEUS for the initial shipment to be delivered to a port in the Persian Gulf and asked CAMPBELL for a price for the shipment. On June 8, 2012, CAMPBELL advised the UCA by email that the transaction would remain confidential all the way to the end and that the delivery destination was not a problem. CAMPBELL proceeded to advise the UCA that the Uranium would be mixed with Chromite and packed in 200 liter drums and that the proportion of MEUS will range between 75-78.5 percent, with Chromite making up the remaining 23.5 to 25 percent. CAMPBELL further advised that the drums would be sealed and packed into 20 foot containers and would be declared as Chromite to the authorities in Sierra Leone. CAMPBELL also advised the UCA that the success of the MEUS project would be to use two different shipping companies and split up the containers.

20. On June 8, 2012, the UCA advised CAMPBELL in a SKYPE conversation that the delivery would be a the port of Bandar Abbas in Iran to which CAMPBELL responded that would not be a problem because he has the backing of his country and controls the port in Sierra Leone.

21. On June 28, 2012, in a SKYPE communication CAMPBELL remineded the UCA that the MEUS would be declared as Chromite to the government of Sierra Leone and that all paperwork will display Chromite as the material being exported. CAMPBELL instructed the UCA to identify his company as an investment company interested in the mining of Chromite in Sierra Leone. CAMPBELL advised the UCA that he would travel to the United States with the purity analysis to meet with the UCA. CAMPBELL informed the UCA that he should not worry as he had done this same type of deal twice before with China and Ecuador and would provide the UCA with a copy of his passport with the entry stamps to show the trips to the UCA.

22. On August 23, 2012, CAMPBELL communicated with the UCA via SKYPE and requested that the UCA provide assistance to CAMPBELL by providing a

letter that CAMPBELL could use to obtain his Visa to come to the United States and show the UCA the MEUS product. CAMPBELL advised the UCA that he (CAMPBELL) was a complete miner with a Master's of Science degree in Geophysics and that this would be the third time that he had done this type of deal and asked if the UCA would pay for his travel to the United States because that was done in the deals with China and Ecuador. The UCA advised CAMPBELL that he would need to get his own Visa and make his own arrangements whereupon CAMPBELL advised that the deal would not happen.

23. On August 24, 2012, CAMPBELL sent an email to the UCA advising that the MEUS project would not happen because as a broker he cannot spend his own money because he could not spend $30,000 on a contract that had not yet been executed. CAMPBELL advised the UCA that the MEUS project was "very risky and you know your country does not support the ir [Iranian] people", CAMPBELL asserts that the UCA failed to understand that "in [the] whole world [it] is not easy to get someone who will dedicate his time and energy for [the] success[ of the project."

24. On March 7, 2013, and again on March 19, 2013 CAMPBELL sent email's to the UCA advising that he would like to reestablish the negotiations with the UCA for the MEUS project.

25. On March 21, 2013, CAMPBELL sent an email to the UCA advising that he had been in Dubai meeting with an engineer from Pakistan on a MEUS deal and the Pakistan national had advised CAMPBELL of the fraud being done by other suppliers in Africa. This made CAMPBELL understand why the UCA was concerned and wanted to resume negotiations for the MEUS transaction. CAMPBELL stated that he was willing to come to the US with his "team" for a presentation on the MEUS project to show the UCA that he could be trusted.

26. On April 2, 2013, the UCA sent an email to CAMPBELL and advised CAMPBELL that unless he could travel to the United States and convince the Iranian buyer that CAMPBELL was serious and able to deliver the MEUS product to the Port of Bandar Abbas that CAMPBELL should not contact the UCA again.

27. Between April 3, 2013 and April 5, 2013, CAMPBELL and the UCA

-6-

exchange email messages in which CAMPBELL requests that the UCA send a letter to CAMPBELL inviting him to come to the United States that CAMPBELL can use to get his US Visa and the UCA responds that no such letter will be sent and that if CAMPBELL is serious about the MEUS project he should come to the US on his own or forget about the business deal.

28. On April 27, 2013, CAMPBELL sent an email to the UCA again requesting assistance in getting his US Visa and advising that his mines are located at the country borders of Liberia and Sierra Leone. The UCA responded by email on April 28, 2013 [jmm] and advised CAMPBELL that he would not provide any assistance to CAMPBELL and that it was up to CAMPBELL to prove that this was not a scam by meeting the UCA in the US or to stop contacting the UCA.

29. On April 29, 2013, CAMPBELL sent an email to the UCA advsing that he made arrangement to get his US Visa throught the Ministry of Foreign Affairs in Sierra Leone and that if he was not able to make the trip he would send his associate to make the presentation on the MEUS project. CAMPBELL advised the UCA that the UCA could verify his identity through his voluntary work through his NGO (non-governmental organization) in Sierra Leone. Investigation has revealed that CAMPBELL has a website for a charitable organization called Horizon Foundation which is an NGO.

30. On May 20, 2013, CAMPBELL sent an email to the UCA advising that the only date available for an interview at the US Embassy was in September 2013. CAMPBELL stated that he spoke to an associate in Mexico and he requested an invitation letter from him so that he could get a Mexican Visa and be able to fly to the Bahamas to meet the UCA if he could not get a US Visa.

31. On August 7, 2013, CAMPBELL sent several emails to the UCA advising that he had obtained his US Visa and sending copies of his US Visa to the UCA.

32. On August 8, 2013, CAMPBELL sent a contract to the UCA by email outlining the details of the MEUS project for the sale of 1000 tons [jmm] of "M308"(MEUS Oxide). CAMPBELL follows the email up by engaging in a telephone call with the UCA to discuss discrepancies in the contract which must be addressed before the Iranian buyers will allocate money for the contract. CAMPBELL confirms that the material [jmm]

referred to in the contract is Uranium. The UCA asked CAMPBELL if he referred to the UCA's company in getting his US Visa and CAMPBELL informed the UCA that he used his NGO at the interview and stated that the purpose of his visit to the US was for a conference and that he made no mention of the Uranium deal.

33. A query was made of the Department of State database and verification was obtained that CAMPBELL had in fact obtained a US Visa which was valid for travel until August 31, 2013. Further it was verified that CAMPBELL gave as his stated purpose for his visit that he was a social worker with Horizon Foundation and wanted to go to New York to participate in a UN conference on behalf of the NGO, however CAMPBELL could not provide the name of his UN contact in NY or any further information about the conference.

34. On or about August 12, 2013, CAMPBELL had a SKYPE conversation with the UCA and advised that he would be traveling to the US on August 17 for a week to meet with the UCA and the buyers to complete the contract. CAMPBELL advised the UCA that they should meet in Miami on August 19, 2013.

35. On August 19, 2013, CAMPBELL sent an email to the UCA advising that he would arrive on Wednesday August 21, 2013 in the United States and provided a copy of his flight itinerary. The flight itinerary showed that CAMPBELL would be arriving in New York at the JFK Airport on August 21, 2013 at 4:25 pm. In a separate conversation CAMPBELL advised the UCA that he had good news and he would be bringing samples of the U308 and that he had consulted a friend at the airport about how to get the samples on the plane.

36. On August 20, 2013, CAMPBELL had a telephone conversation with the UCA and advised that he would be arriving at JKF Airport and would get a connecting flight to Miami to meet with the UCA.

36. On August 20, 2013 CAMPBELL sent an email to the UCA verifying his flight and providing a record locator for his flight information.

38. A check with Air France verified that CAMPBELL had checked in for his flight to JFK Airport in New York and would be arriving in the United States at approximately 4:10 PM on August 21, 2013.

-8-

39. On August 21, 2003, your affiant received information that CAMPBELL had changed his flight number to JFK Airport in New York and had checked in on Air France flight number 3628 which is scheduled to arrive at the JFK Airport in New York at approximately 3:19 PM on August 21, 2013.

40. On August 21, 2013, PATRICK CAMPBELL arrived at the JFK Airport in New York, USA via Air France Flight 3628 and presented himself for inspection and admission to the United States as observed by agents of Immigration and Customs Enforcement. The UCA verified that the person who presented himself for inspection was the same PATRICK CAMPBELL that had conducted SKYPE video conversations with and was the same person depicted on the U.S. Visa that was sent to the UCA by PATRICK CAMPBELL.

41. On August 21, 2013, PATRICK CAMPBELL cleard U.S. Customs at Terminal 4 of the JFK Airport in New York and was admitted into the United States. After being admitted into the United States, PATRICK CAMPBELL was observed by agents of Immigration and Customs Enforcement as he entered the Terminal four concourse and made inquiry from an unknown person regarding where he could arrange a connecting flight. Shortly thereafter, CAMPBELL was arrested by ICE Agents and his luggage was taken into ICE custody.

42. At the time of his arrest CAMPBELL was in possession of an airline ticket for travel to Miami, Florida later on August 21, 2013.

43. CAMPBELL was advised of his Miranda Rights and agreed to talk to the agents. Initially, CAMPBELL told agents that he was involved in a business deal with the UCA and that the UCA was to be an investor in CAMPBELL's gold mines and that he was the owner and Executive Director of Horizons Limited in Sierra Leone. Upon further questioning CAMPBELL admitted that he had been talking to the UCA about Uranium and that he had send the UCA a contract for the sale of Uranium to be delivered to Iran. CAMPBELL further admitted that he had agreed to ship Uranium to Iran and that it would be mixed with Chromite and Zircon.

44. CAMPBELL initially denied bringing a sample of the Uranium to the United States and it was only when CAMPBELL was confronted by the UCA that

CAMPBELL admitted that he had brought a sample of the raw Uranium ore with him and that the Uranium was concealed in the inside soles of the shoes in his luggage. CAMPBELL assisted the agents in removing the Uranium from beneath the inside soles of his shoes and plastic bags containing Uranium were recovered from two of CAMPBELL's shoes.

45. Agents recovered a portable thumb drive from the defendant and the defendant gave consent for the agents to examine the thumb drive. Upon preliminary examination the agents observed that the thumb drive contained a contract for the sale and delivery of MEUS (Uranium 308) and a power point presentation on the MEUS delivery project that had been discussed between CAMPBELL and the UCA.

46. By flying into the JFK Airport in New York for the purpose of finalizing the negotiations for the sale and supply of U308 to Iran and bringing with him a sample of the Uranium, a contract for the sale and supply of the U308, and other materials related to the supply of U308 to Iran, CAMPBELL has engaged in a transaction in furtherance of his brokering of the sale and supply of U308 to Iran within the United States.

Therefore, your affiant has probable cause to believe that PATRICK CAMPBELL has committed the violation of Brokering the supply of goods which the defendant knew were destined and intended for supply to Iran in violation of the International Emergency Economic Powers Act (IEEPA) Title 50, United States Code, Section 1701, 1705 and the Iranian Transaction Regulations, 31 CFR 560.416, 560,204 and 560.203.

FURTHER AFFIANT SAYETH NAUGHT.

_____
LOUISE MILLER, Special Agent
Immigration and Customs Enforcement,
Homeland Security Investigations

Sworn to before me this 21st day of August, 2013.

_____
BARRY S. SELTZER
CHIEF UNITED STATES MAGISTRATE JUDGE