UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO: <u>13-60245-CR-MARRA(s)</u>
50 U.S.C. § 1705

UNITED STATES OF AMERICA

vs.

PATRICK CAMPBELL,

           Defendant.
_____/

FILED BY _____ D.C.

FEB 25 2014

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. FT. LAUD.

## SUPERSEDING INDICTMENT

The Grand Jury charges:

## GENERAL ALLEGATIONS

At all times material to this Indictment:

### Statutes and Regulations

1. The President of the United States of America, by virtue of the International Emergency Economic Powers Act (IEEPA), Title 50, United States Code, Section 1701 <u>et seq.</u>, was granted authority to deal with unusual or extraordinary threats to the national security, foreign policy and economy of the United States.

2. Under Title 50, United States Code, Section 1705, of IEEPA, it is a federal criminal offense for a person to violate, conspire to violate or cause a violation of any license, order, regulation or prohibition issued under that chapter.

3. On March 15, 1995, pursuant to IEEPA, the President of the United States issued

Executive Order 12957 finding that the actions and policies of the Government of Iran constitute an unusual and extraordinary threat to the national security, foreign policy and economy of the United States, and declared a national emergency to deal with that threat. Executive Order 12957 was expanded and continued by Executive Orders 12959 and 13059.

4. To implement the Executive Orders, the United States Department of the Treasury, Office of Foreign Assets Control (OFAC), issued the Iranian Transactions and Sanctions Regulations, Title 31, Code of Federal Regulations, Part 560 (OFAC Regulations).

5. Under Title 31, Code of Federal Regulations, Section 560.203, it is illegal to undertake any transaction within the United States or by any United States person that evades or avoids, or has the purpose of evading or avoiding or attempts to violate the OFAC Regulations.

6. Under Title 31, Code of Federal Regulations, Section 560.204, it is illegal to export, re-export, sell, or supply, directly or indirectly, any goods, technology or services, from the United States or by a United States person, wherever located, to Iran or the Government of Iran.

7. Under Title 31, Code of Federal Regulations, Section 560.203, it is illegal to form any conspiracy to violate the OFAC Regulations.

8. Under Title 31, Code of Federal Regulations, Section 560.416, the term "services" includes the performance of a brokering function by a United States person.

9. Under Title 31, Code of Federal Regulations, Section 560.314, the term "United States person" means any United States citizen, permanent resident alien, entity organized under the laws of the United States (including foreign branches), or any person in the United States.

## Background

10. Defendant PATRICK CAMPBELL (CAMPBELL) represented that he was the

Managing Director of Horizon (SL) Limited in Freetown, Sierra Leone.

11. CAMPBELL represented that he was the Executive Director of Horizon Foundation in Freetown, Sierra Leone.

12. CAMPBELL represented that I.F. was his business partner.

13. I.F. represented that he was employed by Horizon Foundation in Freetown, Sierra Leone.

14. CAMPBELL represented that A.S.R. was his business associate.

## COUNT 1

1. Paragraphs 1 through 14 of the General Allegations above are restated and re-alleged as if fully set forth herein.

2. From on or about May 29, 2012, and continuing to on or about August 21, 2013, in Broward County, in the Southern District of Florida, and elsewhere, the defendant,

**PATRICK CAMPBELL,**

did knowingly and willfully attempt to cause the export of services, from the United States to Iran, in connection with the sale and supply of 1,000 tons of uranium to Iran, without first having obtained the required licenses and authorizations from the United States Department of the Treasury, Office of Foreign Assets Control, in violation of Title 50, United States Code, Section 1705, and the Iranian Transactions and Sanctions Regulations, Title 31, Code of Federal Regulations, Sections 560.203 and 560.204.

## COUNT 2

1. Paragraphs 1 through 14 of the General Allegations above are restated and re-alleged as if fully set forth herein.

2. From on or about May 29, 2012, and continuing to on or about August 21, 2013, in Broward County, in the Southern District of Florida, and elsewhere, the defendant,

**PATRICK CAMPBELL,**

did knowingly and willfully combine, conspire, confederate and agree with persons known and unknown to the Grand Jury to provide services in furtherance of the sale and supply of goods, that is uranium, to Iran and the Government of Iran, and to export services, from the United States to Iran, in connection with the sale and supply of 1,000 tons of uranium to Iran, without first having obtained the required licenses and authorizations from the United States Department of the Treasury, Office of Foreign Assets Control, in violation of Title 50, United States Code, Section 1705, and the Iranian Transactions and Sanctions Regulations, Title 31, Code of Federal Regulations, Section 560.203(b).

## Objects of the Conspiracy

3. The objects of the conspiracy were to:

    a. obtain a contract to provide services in furtherance of the sale and supply uranium to Iran and the Government of Iran; and

    b. illegally enrich the co-conspirators by unlawfully supplying uranium to Iran and the Government of Iran.

## Manner and Means

4. In furtherance of the conspiracy and to effect the objects thereof, the following manner and means, among others, were used:

4

  a. CAMPBELL would and did engage in communications with an undercover agent (UCA) of United States Immigration and Customs Enforcement (ICE), who was located in Ft. Lauderdale, Florida, in furtherance of obtaining a contract to sell and supply uranium to Iran.

  b. CAMPBELL would and did discuss the shipment and concealment of the uranium which was to be provided to Iran.

  c. CAMPBELL and persons known and unknown would meet with the UCA to finalize the arrangements for the shipment of uranium to Iran.

  d. CAMPBELL would and did travel to the United States to finalize the contract for the shipment of uranium to Iran.

### Overt Acts

5. In furtherance of the conspiracy and to effect the objects thereof, there were committed in the Southern District of Florida, and elsewhere, at least one of the following overt acts:

  a. On or about May 29, 2012, CAMPBELL sent an email message to an ICE undercover business advising that his company exported uranium all over the world and providing his contact information.

  b. On or about May 31, 2012, CAMPBELL placed a telephone call from Sierra Leone to the ICE UCA located in Ft. Lauderdale, Florida, and reiterated to the UCA that his company had uranium for sale.

  c. On or about June 1, 2012, CAMPBELL sent an email to the UCA in which he explained that Horizon (SL) Limited, located in Freetown, Sierra Leone, deals in minerals, including uranium and chromite, for sale and export to international companies.

d. On or about June 4 and 5, 2012, CAMPBELL exchanged e-mail messages with the UCA in which they discussed whether CAMPBELL could deliver uranium blended with other ore types to a country in the Middle East.

e. On or about June 5, 2012, CAMPBELL engaged in a telephone conversation with the UCA and confirmed that he had uranium for sale and discussed meeting in the United States or Europe to discuss a uranium transaction.

f. On or about June 5, 2012, CAMPBELL sent an email to the UCA informing him that Horizon (SL) Limited can blend uranium oxide with chromite ore to comply with the UCA's request to receive uranium in the form of ore-rock.

g. On or about June 5, 2012, CAMPBELL informed the UCA that the majority of Horizon (SL) Limited's sales were of uranium and chromite.

h. On or about June 6, 2012, CAMPBELL advised the UCA that they should use the code word "MEUS," which would stand for "Middle East Uranium Shipment," for their transaction and no longer use the actual name of the item while speaking on the telephone.

i. On or about June 8, 2012, CAMPBELL sent an email to the UCA in which he stated that the delivery of uranium to Iran would not be a problem and described how the uranium would be shipped to Iran.

j. On or about June 8, 2012, CAMPBELL and the UCA engaged in a Skype communication in which they discussed the delivery of the uranium to the port of Bandar-Abbas in Iran.

k.  On or about June 27, 2012, CAMPBELL sent an email to the UCA advising that it was difficult to get a visa to the United States from Sierra Leone and that the UCA should send an invitation letter to CAMPBELL, who would instruct the UCA on what to write.

l.  On or about June 28, 2012, CAMPBELL reminded the UCA via Skype that the exported uranium would be declared as chromite to the government of Sierra Leone, and explained a plan to falsely state on customs documents that the UCA's and CAMPBELL's companies were involved in mining investment and mineral exploration.

m.  On or about June 29, 2012, CAMPBELL sent an email to the UCA with the format for the invitation letter including the fact that the delegates invited to the meeting on the uranium transaction would be CAMPBELL and I.F.

n.  On or about July 4, 2012, CAMPBELL sent an email to the UCA asking that the invitation letter be sent to the U.S. Embassy soon and advising that this would be the third time he had done this kind of business.

o.  On or about August 8, 2012, CAMPBELL sent an email to the UCA advising that he would be sending the names of his associates who needed a United States visa and informed the UCA that the project was done on his side and that his father was an integral part of it.

p.  On or about August 10, 2012, CAMPBELL sent an email to the UCA stating that the persons who would travel to the United States for the meeting were CAMPBELL, W.B.S., and O.K., and that they would bring a presentation on the MEUS project.

q.  On or about August 13, 2012, CAMPBELL and the UCA engaged in a Skype conversation in which CAMPBELL acknowledged receipt of the revised invitation letter.

     r.     On or about August 23, 2012, CAMPBELL engaged in a Skype conversation with the UCA in which CAMPBELL wanted the UCA to pay for the travel arrangements of the three delegates to the United States.

     s.     On or about March 25, 2013, CAMPBELL sent an email to the UCA requesting that three Horizon (SL) Limited employees, CAMPBELL, O.K., and M.B.C., be included in the invitation letter.

     t.     On or about April 5, 2013, CAMPBELL sent an email to the UCA advising that the MEUS was ready and could be mixed with chromite or zircon ores and that the shipments could leave two to three weeks after CAMPBELL returned from the United States.

     u.     On or about April 29, 2013, CAMPBELL sent an email to the UCA advising that he had arranged for his United States visa through the Ministry of Foreign Affairs in Sierra Leone.

     v.     On or about May 7, 2013, CAMPBELL sent an email to the UCA advising that he was going to the United States Embassy in Sierra Leone for his visa and hoped that he and his team would be able to meet the UCA in the United States to discuss business.

     w.     On or about June 16, 2013, CAMPBELL sent an email to the UCA informing him that he will be sending some vital information to the UCA and hoped that the newly-elected president of Iran would not alter their plans.

     x.     On or about June 16, 2013, CAMPBELL engaged in a Skype conversation with the UCA and discussed the fact that that nothing would change after the election in Iran and the embargos would still be in place.

y.  On or about June 20, 2013, CAMPBELL sent a Skype message asking if the UCA was a United States Agent because CAMPBELL is very careful but trusted the UCA and further discussed a possible meeting in the Bahamas before the meeting with the buyer.

z.  On or about August 5, 2013, CAMPBELL falsely stated to an employee of the United States Department of State that he wanted to travel to the United States to participate in a United Nations conference in order to obtain a travel visa.

aa.  On or about August 5, 2013, CAMPBELL obtained a visa to enter the United States from the United States Embassy in Sierra Leone.

bb.  On or about August 7, 2013, CAMPBELL advised the UCA via Skype that he and his associates were coming to the United States and agreed to send the UCA a scanned copy of his visa and a photo of his passport by email.

cc.  On or about August 7, 2013, CAMPBELL sent two emails to the UCA, one with a copy of his passport and visa, and a second with a copy of the passport for A.S.R., whom CAMPBELL identified as the associate accompanying him to the United States.

dd.  On or about August 8, 2013, CAMPBELL sent a Skype message to the UCA confirming that he and an associate would meet with the UCA and the buyer, that he could deliver 1,000 tons of uranium within six months, and that he had sent the contract for the delivery to the UCA via email.

ee.  On or about August 8, 2013, CAMPBELL called the UCA and discussed the contract that CAMPBELL had previously sent.

ff. On or about August 9, 2013, CAMPBELL and the UCA engaged in a Skype conversation about what the buyers expected him to bring to the meeting because he wanted to finalize the contract and start the uranium shipment as soon as he returned to Sierra Leone.

gg. On or about August 15, 2013, CAMPBELL engaged in a telephone conversation with the UCA about the fact that he would arrive in Miami, Florida, later that week and asked if the UCA wanted him to bring a sample of the uranium with him.

hh. On or about August 15, 2013, CAMPBELL engaged in a Skype communication in which CAMPBELL advised the UCA that he would be traveling alone because CAMPBELL wanted to meet the UCA before the UCA met any of CAMPBELL's associates.

ii. On or about August 20, 2013, CAMPBELL informed the UCA via telephone that he had a seat on an Air France flight the next day and that he had good news because he had spoken to a friend at the airport and he would be bringing the uranium sample.

jj. On or about August 20, 2013, CAMPBELL engaged in a telephone conversation with the UCA and advised that he would arrive in New York, New York, and then catch a connecting flight to Miami, Florida.

kk. On or about August 20, 2013, CAMPBELL, with the assistance of his brother, concealed a sample of the uranium in the soles of shoes packed in his luggage, which was to be transported to South Florida for the meeting with the UCA.

ll. On or about August 21, 2013, CAMPBELL arrived in New York, New York, en route to Miami, Florida, with a sample of uranium concealed in his shoes, a PowerPoint presentation on the MEUS, a contract for the MEUS, and other related documents.

All in violation of Title 50, United States Code, Section 1705, and Title 31, Code of Federal Regulations, Sections 560.203 and 560.204.

A TRUE BILL

FOREPERSON

_____
WIFREDO A. FERRER
UNITED STATES ATTORNEY

_____
MICHAEL WALLEISA
ASSISTANT UNITED STATES ATTORNEY

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

| UNITED STATES OF AMERICA | CASE NO.    13-60245-CR-MARRA(s) |
|---|---|
| vs. | |
| PATRICK CAMPBELL, | **CERTIFICATE OF TRIAL ATTORNEY*** |
| **Defendant.** | |
| _____ / | **Superseding Case Information:** |

**Court Division**: (Select One)

Miami ____    Key West ____
FTL  X       WPB ____    FTP ____

New Defendant(s) ____ Yes  x  No
Number of New Defendants   0
Total number of counts    2

I do hereby certify that:

1. I have carefully considered the allegations of the indictment, the number of defendants, the number of probable witnesses and the legal complexities of the Indictment/Information attached hereto.

2. I am aware that the information supplied on this statement will be relied upon by the Judges of this Court in setting their calendars and scheduling criminal trials under the mandate of the Speedy Trial Act, Title 28 U.S.C. Section 3161.

3. Interpreter:    (Yes or No)    No
   List language and/or dialect

4. This case will take   10   days for the parties to try.

5. Please check appropriate category and type of offense listed below:
   (Check only one)                              (Check only one)

   I    0 to 5 days     ____         Petty    ____
   II   6 to 10 days    X            Minor    ____
   III  11 to 20 days   ____         Misdem.  ____
   IV   21 to 60 days   ____         Felony   X
   V    61 days and over ____

6. Has this case been previously filed in this District Court?   ____   (Yes or No)
   If yes:
   Judge: _____  Case No. _____
              (Attach copy of dispositive order)
   Has a complaint been filed in this matter?   YES
   If yes:
   Magistrate Case No.                  13-6402-BSS
   Related Miscellaneous numbers:
   Defendant(s) in federal custody as of    08/22/2013
   Defendant(s) in state custody as of
   Rule 20 from the District of

   Is this a potential death penalty case?    ____ (Yes or No)

7. Does this case originate from a matter pending in the Northern Region of the U.S. Attorney's Office prior to October 14, 2003?    ____ Yes    X   No

8. Does this case originate from a matter pending in the Central Region of the U.S. Attorney's Office prior to September 1, 2007?    ____ Yes    X   No

                              _____
                              MICHAEL G. WALLEISA
                              ASSISTANT UNITED STATES ATTORNEY
                              Florida Bar No./Court 539570

Penalty Sheet(s) attached                                    REV 4/8/08

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

## PENALTY SHEET

**Defendant's Name**: PATRICK CAMPBELL          **Case No**: 13-60245-CR-MARRA(s)

Count: 1

Attempting to cause the export of services to Iran

50 U.S.C. § 1705

**\* Max. Penalty:** 20 years' imprisonment, $1,000,000 fine, 3 years' supervised release.

Count: 2

Conspiracy to supply goods and services to Iran

50 U.S.C. § 1705

**\*Max. Penalty:** 20 years' imprisonment, $1,000,000 fine, 3 years' supervised release.

Count:



**\*Max. Penalty:**

Count:



**\*Max. Penalty:**

\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms or forfeitures that may be applicable.